IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STACY B. PATTERSON, | ) | CASE NO. 1:16CV420 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Stacy Patterson ("Patterson") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his applications for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the

undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule

72.2(b)(1).

As set forth more fully below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

In 2010, Patterson filed an application for DIB, an ALJ determined that he was not

disabled in a decision dated February 16, 2012, and this decision was affirmed by the Appeals

Council.  Tr. 151-160, 167.  On June 25, 2013, Patterson protectively filed his current

application for DIB alleging a disability onset date of February 17, 2012.  Tr. 82, 302.  Patterson

alleged disability based on the following: back injury, anxiety, panic attacks, depression and

"PMSS."  Tr. 306.  After denials by the state agency initially (Tr. 173) and on reconsideration

(Tr. 185), Patterson requested an administrative hearing.  Tr. 215, 216.  A hearing was held

before Administrative Law Judge ("ALJ") Penny Loucas on February 18, 2015 (Tr. 101-135).

At the Hearing, Patterson's attorney explained to the ALJ that Patterson had an appointment to

file an application for SSI and requested that his two applications be considered together.  Tr.

103.  After discussion, the ALJ granted this request and determined that, after Patterson's SSI

application was processed and joined with his DIB application, she would hold a second,

supplemental hearing, in addition to the hearing she held that day.  Tr. 102-105.  She held a

supplemental hearing on June 24, 2015.  Tr. 1030-1065.  In her July 30, 2015, decision (Tr. 82-

93), the ALJ determined that Patterson could perform jobs that exist in significant numbers in the

national economy, i.e., he was not disabled.  Tr. 92.  In doing so, the ALJ found that she was

bound by the prior ALJ's decision because there was no new and material evidence

demonstrating a significant deterioration in Patterson's condition since the prior decision date.

Tr. 82.  Patterson requested review of the ALJ's decision by the Appeals Council (Tr. 77) and,

on February 8, 2016, the Appeals Council denied review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Patterson was born in 1969 and was 44 years old on the date his current DIB application

was filed.  Tr. 280.  He previously worked as a field manager/janitorial supervisor and a

landscaping worker.  Tr. 109.  He graduated from high school.  Tr. 110.

### B.  Relevant Medical Evidence[1]

[1] Patterson did not challenge the ALJ's findings regarding his mental impairments.  Accordingly, only the medical evidence relating to Patterson's challenged physical impairments is summarized and discussed herein.

Patterson injured his back in a car accident in 2007.  Tr. 390, 820.  On December 2, 2008, he underwent lumbar surgery.  Tr. 390, 820.

On February 7, 2012, Patterson saw Brian Bantum, M.D., and Richard Wilson, M.D., for low back pain he continued to have since his accident in 2007.  Tr. 439-442.  He had improved for one year after his 2008 surgery but "was not currently back to his baseline but is still having significant symptoms."  Tr. 439.  He did not "feel much different" on his Lyrica medication and had not tried Neurontin; he was currently taking Aleve and Tylenol.  Tr. 439.  His back pain was achy, throbbing and constant, primarily on the left side, and it radiated to his left lateral thigh with associated tingling in his thigh.  Tr. 439.  His leg pain was sharp and occurred for a few minutes 2-3 times a day.  Tr. 439.  Upon exam, he could toe-walk but had difficulty heel-walking on his left and he had a posterior pelvic tilt.  Tr. 441.  He had tenderness to palpation at L4-5 and in his sacroiliac joints bilaterally; severely limited flexion; moderately limited extension; positive Yeoman's left sacroiliac joint; slightly limited sensation in his left lower extremity; and slightly diminished deep tendon reflexes in his right lower extremity.  Tr. 441.  The doctors' impression was diffuse objective findings on exam most consistent with chronic left L4-5 radiculopathy, tight hamstrings on the left side, posterior pelvic tilt, and deconditioning.  Tr. 442.  They recommended physical therapy consisting of stretching exercises and core conditioning and strengthening; a regular exercise program; and prescribed Neurontin and advised he stop taking NSAIDS.  Tr. 442.

On March 25, 2012, Patterson visited the emergency room after he tripped on a rock while landscaping and fell on his right side.  Tr. 395.  He had discomfort in his ribs and a right rib contusion. Tr. 395.  He denied back or joint pain.  Tr. 402.  He had normal range of motion and no swelling. Tr. 403.  On May 31, 2012, he saw Paula Finton, M.D., for a follow-up visit. Tr.

390-394.  His rib pain had improved and he stated that he had been traveling back and forth from Tennessee.  Tr. 390.  He complained of left lumbar back pain radiating to his thigh.  Tr. 390. Upon exam, he had a decreased range of motion in his spine with flexion.  Tr. 392.  He had not followed up with a chest x-ray, as recommended.  Tr. 392.

On July 15, 2013, Patterson saw Naveen Turlapati, M.D., to establish care and get medication refills.  Tr. 518.  Regarding his back pain, he reported constant back numbness and tingling and sharp shooting pains in both of his thighs.  Tr. 518.  Upon exam, he had a full range of motion and reported some improvement when taking his tramadol and gabapentin.  Tr. 519. His weight was listed as 313 pounds for a BMI of 38.16.  Tr. 520.  He had decreased sensation in the left leg compared to the right, strength of 4/5 in the left leg compared to right; absent reflexes in the lower extremities; and positive straight leg raises in both legs.  Tr. 520.  Dr. Turlapati ordered a lumbar spine x-ray, referred Patterson to pain management and physical therapy, and gave him a pamphlet on back exercises.  Tr. 520.

On August 27, 2013, Patterson saw Dr. Wilson again for low back pain.  Tr. 617.  His back pain occasionally radiated to his left leg and he had numbness as well.  Tr. 617.  His pain was aggravated by activity, mostly bending.  Tr. 617.  He was taking Neurontin, Advil and naproxen, the latter of which did not help his pain.  Tr. 617.  Upon exam, he had tenderness to palpation in his left paraspinals and midline at L4-5; mildly limited flexion and extension with end range pain; and a negative Faber's test in his hips, albeit pain-inducing in his back.  Tr. 620. Patterson was again referred to physical therapy for core strengthening and exercises and advised to stop taking NSAIDs.  Tr. 620.

On September 30, 2013, Patterson had a physical therapy evaluation with Constance Sinreich, PT.  Tr. 633-636.  Patterson stated that he was independent with his self-care and

activities of daily living, though he had problems donning and doffing his shoes. Tr. 634. He rated his pain as intermittent, 8/10. Tr. 635. His pain worsened with prolonged sitting, standing, walking and sleeping; it improved with medication, rest, ice, heat, and change of position. Tr. 635. Upon exam, his range of motion was significantly limited by pain in all directions. Tr. 635. He had motor strength of 4+/5 in multiple areas of lower extremities bilaterally; positive straight leg raise testing on the left at 45˚ both seated and supine; positive Patricks/Faber test on the left; and decreased left stance time on gait testing. Tr. 636. Sinreich assessed that Patterson "appear[ed] to be limited in mobility and activity due to pain, poor postural awareness, and poor body mechanics." Tr. 637. Sinreich noted that Patterson underwent physical therapy in the past with limited success and opined that he would benefit from therapy to improve his pain and postural awareness. Tr. 637.

On October 17, 2013, Patterson reported no changes to Sinreich since his evaluation and stated that he was performing his home exercises without difficulty. Tr. 642. On October 31, 2013, he reported that his pain had improved since his last physical therapy visit, was now 5/10, and that he was "tolerating more at home." Tr. 649. His range of motion remained limited by pain and he had an antalgic gait. Tr. 650.

On November 5, 2013, Patterson saw Dr. Wilson. Tr. 625. He reported tolerating his Neurontin and that it provided relief, that he continued to have left lower back pain and numbness that frequently radiated to the left lateral and anterior thigh above his knee, and that he was able to sit for 15-20 minutes. Tr. 625. Upon exam, he had decreased tenderness to palpation, limited flexion to 50-60˚ and mildly limited extension. Tr. 628. Dr. Wilson noted that his "aggravated symptoms are improving with conservative management." Tr. 628.

On November 25, 2014, Patterson went to the emergency room complaining of altered speech, vision changes, confusion, facial droop, and headache. Tr. 784. He was diagnosed with confusion, headache, intermittent left lateral rectus palsy and transient ischemic attack and admitted for observation. Tr. 788. A CT scan of his brain and an x-ray of his chest were both normal. Tr. 791. Sanjay Choudhary, M.D., stated that an underlying stroke should be ruled out and continued Patterson on his medications for dyslipidemia, hypertension, and depression. Tr. 791.

On August 29, 2014, Dr. Choudhary wrote a prescription for a disability placard due to lumbar radiculopathy. Tr. 811.

On September 17, 2014, Patterson saw neurologist Rishi Goel, M.D., for compression fracture, disc bulge, and follow-up neurological visit. Tr. 748. Patterson reported that his pain was 70% lower back and 30% leg. Tr. 748. He rated his pain as an 8/10, made worse with lumbar flexion and extension. Tr. 748. He had normal gait and ambulation and normal reflexes, sensation and muscle strength. Tr. 749. A review of a recent MRI of Patterson's lumbar spine showed no significant abnormality in the vertebral body marrow; disc desiccation at L3-4 and L4-5; chronic compression fracture at T12 with approximately 50% loss of height; deformity of the lamina on the left compatible with prior laminectomy; disc bulge at L3-4 with posterior annular tear and moderate arthrosis and mild foraminal narrowing on the left; disc bulge at L4-5; moderate facet arthrosis at L5-S1; and a left renal lesion. Tr. 751. The impression was degenerative lumbar spine and disc changes and that the left renal lesion could be renal cell carcinoma and a CT scan for further evaluation was recommended. Tr. 752. Dr. Goel advised Patterson to stop smoking due to its association with pseudoarthrosis and poor bone healing after

surgery.  Tr. 749.  He referred him to pain management for possible facet injections as well as a lumbar discogram for lower back evaluation.  Tr. 749.

On October 6, 2014, Patterson saw Dr. Choudhary for a medication evaluation.  Tr. 809.  He reported decreased energy level and sleeping poorly and displayed anxiety and pain.  Tr. 809.

On October 14, 2014, Patterson saw David Ryan, M.D., for pain management.  Tr. 754-757.  Upon exam, he had "very little" range of motion and positive facet loading in his lumbar spine, +1 deep tendon reflexes in his bilateral lower extremities, and "Patrick's maneuver localized to the facets."  Tr. 756.  Dr. Ryan performed two left L3-L5 medial nerve branch blocks.  Tr. 757.

On December 10, 2014, Patterson saw Dr. Goel and reported no success with the facet injections.  Tr. 813.  Dr. Goel opined that Patterson's only option was a lumbar spine fusion "with the hope that this will help alleviate his facet mediated pain."  Tr. 813.

On January 30, 2015, Dr. Goel performed lumbar fusion surgery, a posterolateral fusion at L4-5 and L5-S1 with L4 to S1 pedicle screw instrumentation.  Tr. 816-817.  Patterson saw Dr. Goel for a follow-up on February 11, 2015, stating that his left leg pain had gone away completely and he was having minor incisional pain.  Tr. 828-831.  A CT scan on April 20, 2015, showed intact hardware in satisfactory position and stable compression deformity of T12 vertebral body.  Tr. 823.

On April 24, 2015, Patterson went to the emergency room complaining of increased low back pain after slipping in the bathtub on the previous Tuesday.  Tr. 833.  Upon exam, he had diffuse, moderate tenderness in his lumbar spine and decreased range of motion; his alignment was normal.  Tr. 834.  A CT scan revealed intact hardware, degenerative changes, and stable post-operative changes.  Tr. 835.  There was a probable left renal exophytic cyst observed.  Tr.

835. He was diagnosed with acute low back pain and he was started on Valium to help with pain management and muscle relaxation. Tr. 836.

On April 29, 2015, Patterson saw Dr. Goel for follow-up after his emergency room visit. Tr. 826. Dr. Goel stated that Patterson had no fracture or loosening hardware. Tr. 826. He renewed his muscle relaxants. Tr. 826.

On May 3, 2015, Patterson went to the emergency room with chest pain. Tr. 897. He also had left flank and back pain which he believed was related to the cyst on his left kidney. Tr. 897. He was admitted for further work-up. Tr. 897. Patterson underwent a cardiac stress test that was "probably" abnormal, but "the diagnostic confidence in the study is reduced due to [his] large body habitus and inability to submit to prone imaging." Tr. 887. A CT scan of his kidneys showed a mass within the left kidney, "concerning for renal cell carcinoma." Tr. 893, 896. Patterson saw Kailash Kedia, M.D., who diagnosed him with left upper pole renal cell carcinoma and recommended left radical nephrectomy. Tr. 913. Patterson underwent a left nephrectomy, tolerated the surgery well, and his pain was under reasonable control. Tr. 955. He was diagnosed with chronic kidney disease, stage III. Tr. 983.

On May 14, 2015, Patterson saw David Ryan, M.D., for a follow-up visit. Tr. 1003-1009. He rated his pain 10/10. Tr. 1003. He was 3.5 months post-surgery from his laminectomy and continued to have significant low back pain and expressed difficulty weaning off opiates. Tr. 1003. Pain control since his recent nephrectomy had also been very difficult. Tr. 1003. He was walking with a cane and had tenderness to palpation in his left sacroiliac joint. Tr. 1005. Dr. Ryan prescribed Oxycodone and opined that, after Patterson healed and he was able to tolerate lying on his abdomen, injections for sacroiliac joints would be considered. Tr. 1009.

### C. Medical Opinion Evidence—State Agency Reviewers

On August 16, 2013, state agency reviewing physician William Bolz, M.D., reviewed Patterson's record.  Tr. 180-181.  Regarding Patterson's residual functional capacity ("RFC"), Dr. Bolz adopted the RFC from the prior ALJ's decision from February 16, 2012, pursuant to the Agency Rule 98-4 and *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997), i.e., that Patterson could perform light work with postural and environmental limitations.  Tr. 180-181.

On September 26, 2013, state agency reviewing physician Leon Hughes, M.D., reviewed Patterson's record and affirmed Dr. Bolz's opinion.  Tr. 192-193.

### D.  Testimonial Evidence

#### 1.  Patterson's Testimony

Patterson was represented by counsel and testified at both administrative hearings.  Tr. 109-135; 1035-1057.  At his first hearing, he described his car accident in 2007 and the timeline of his back problems.  Tr. 111-112.  He stated that after the accident he was on pain medication and getting injections but that they were not helping him and then he had his first surgery.  Tr. 113.  His insurance changed after that and he began to see different doctors.  Tr. 114.  One day while walking down stairs (using his cane and holding onto the railing), "something popped in my spine."  Tr. 114.  He asked for an MRI but the doctors would only take x-rays of his back.  Tr. 115.  He got different insurance and doctors and he got an MRI towards the end of 2014.  Tr. 115.  Based on his MRI results, the doctors sent him to pain management, where he received a "pain block shot."  Tr. 116.  However, 7 or 8 hours after the injection, he experienced so much pain he could not get out of bed.  Tr. 116-117.  His doctor told him that he could not have any more injections and that he should contact his surgeon.  Tr. 116-117.  Patterson's surgeon told him that his only option was to have a second surgery—"three fusions and the two rods"—which

he underwent (in January 2015).  Tr. 117.  He stated that his surgeon told him that he had the

spine "almost of a 70-year-old that's been doing construction ever since he was about 16-17

years of age, that had kind of a bad back.  That's how bad my spine looked."  Tr. 117.

The ALJ asked if a worker's compensation case member ever recommended that he seek

vocational training and Patterson stated that he did not recall such a recommendation.  Tr. 119.

When asked if he considered it himself, he stated that he had not; "I just go to the doctors and

take their advice and what they tell me to do."  Tr. 119.  He also explained that he is afraid to go

out in public, that he sees a counselor, and that "[i]t keeps me from doing a lot of things that I

would love to be able to get out there and do."  Tr. 120.  He explained that he cannot go back to

work because of his mental problems and his back problems.  Tr. 120.  He tried "light duty

dusting" but his pain starts and he has to stop.  Tr. 120.  He has not looked for work since his

accident in 2007; "I was under doctor's care."  Tr. 122.  He also explained that after his accident

he became addicted to pain medications.  Tr. 122.  When he realized his addition, in 2010, he

voluntarily placed himself in a treatment program and has been doing well since then.  Tr. 122-

123.  He was prescribed pain medications after his second surgery and his wife has been

controlling his usage.  Tr. 123-124, 1038.

Patterson testified that he lived with his wife in a house.  Tr. 124.  Prior to that, in late

2012 to early 2013, he was living with his parents in their house.  Tr. 124-125.  On a typical day,

he would wake up early and watch the news and try to do some minor stretching.  Tr. 125.  He

could take care of himself, dress himself, and prepare his own meals.  Tr. 125.  He picked up

after himself but did not do yard work because his father liked to do it himself.  Tr. 126.  He

experiences pain "the majority of the time," but he experiences more pain when he is moving

around, walking and sitting for a long period of time.  Tr. 127.  Before his second surgery he

could stand for 20 to 30 minutes but now he could stand for 10-15 minutes, "twenty max."  Tr. 128.  Before his surgery, standing was worse than walking but walking would cause back and leg pain.  Tr. 128.  He could sit for 10 to 20 minutes.  Tr. 128.  When he experienced pain he would have to lie down on his side.  Tr. 128.

Every day Patterson uses a back brace that was prescribed before his second surgery.  Tr. 129-130.  He has had a TENS machine for three years and he uses it every other day, but he has not used it since his second surgery.  Tr. 130.  He will be seeing his surgeon in a month to discuss his recovery.  Tr. 131.  In the meantime, he was instructed to walk 3-5 times a day for 10 minutes at a time.  Tr. 131.  He recently stopped smoking because he was instructed by his doctor that smoking cessation would help his bones heal.  Tr. 134.

At the second hearing, Patterson stated that the past three years he has been kept from working because of his mental issues "and my back issue, the pain[.]"  Tr. 1035.  He takes Neurontin for his back pain and anxiety.  Tr. 1036.  Since his recent surgeries he has been taking oxycodone and a muscle relaxer.  Tr. 1039.  He still has a lot of pain in the surgical area and "still [a] little bit at times sharp pains in my left leg, but not as bad."  Tr. 1042.  When asked about how his lifting capabilities have changed before and since his recent back surgery, he stated that he "would never lift that much because of my back.  I mean, that would be stupid of me to go try to lift something heavy and worsen my problem.  But now I don't try to lift anything.  I can't.  It hurts."  Tr. 1043.  When asked if he was able to help carry groceries, he answered that it depends.  Tr. 1044.  He cannot touch his toes because of the rods in his back.  Tr. 1043.

Since his second back surgery, he can sit for 10-15 minutes before the pain starts.  Tr. 1044.  He was forcing himself to sit at the hearing.  Tr. 1044.  Since his left kidney was removed,

he can no longer lie on his left side and has to lie on his right side.  Tr. 1044.  When asked if he had any new, separate symptoms associated with his kidney surgery he stated that his depression and anxiety had worsened "and obviously my back has gotten worse."  Tr. 1045.  Also, he has swelling at the incision site and swollen ankles.  Tr. 1045.  He explained that his kidney problems came to light a couple of months prior to his kidney surgery, when he noticed that he was having pain in his back that was different from his regular back pain.  Tr. 1045.  When he saw his surgeon and he was palpated in his back area, he reacted strongly to palpation and his surgeon said, "this [is]n't your back that's really hurting you right now, it's your kidney, I believe[.]"  Tr. 1046.  He followed up with diagnostics and he was scheduled for emergency surgery.  Tr. 1046.  His kidney was the size of a "youth football" and was ready to "burst."  Tr. 1046.

Patterson testified that he used to enjoy fishing, softball, bowling, lifting weights and hunting, but that he does not do these things anymore because of "this injury."  Tr. 1050.  He does not think he could perform sedentary work because of his back, anxiety and depression.  Tr. 1051.  He does not mow the lawn at the house he now lives in with his wife because of the standing and walking "and the left kidney stopped me.  It's only been a month.  So over a month since I had my kidney removed."  Tr. 1052.  He is not able to help out too much with the household chores.  Tr. 1052.  Currently, he weighed about 274-275 pounds and is 6'4."  Tr. 1052-1053.  He started using a cane in January 2014, about a year before his second back surgery, because his left leg would go numb and it would cause him to fall.  Tr. 1053.

### 2. Vocational Expert's Testimony

Vocational Expert Brett Salkin ("VE") testified at the second hearing.  Tr. 1057-1064. The ALJ asked the VE to determine whether a hypothetical individual of Patterson's age,

education and work experience could perform the work he performed in the past if that person

had the following characteristics: can perform light work; can occasionally use ramps and stairs;

cannot use ladders, ropes or scaffolds; can occasionally stoop and frequently kneel, crouch and

crawl; must avoid moderate exposure to hazards, including moving machinery and unprotected

heights; can maintain attention to carry out repetitive tasks and make simple decisions

independently; can interact appropriately with supervisors and coworkers on a superficial basis

and is limited to occasional and superficial interaction with the general public; and can adapt in a

setting where the duties are routine and predictable but should not be expected to perform strict

time limits or production quotas.  Tr. 1058.  The VE answered that such an individual could not

perform Patterson's past work.  Tr. 1058.  The ALJ asked if there were transferrable skills from

Patterson's past work to work at the light exertional level and the VE stated that there were not.

Tr. 1059.  The ALJ asked if there were other jobs that the hypothetical individual could perform

and the VE stated that such an individual could perform the following jobs: housekeeper

(300,000 national jobs, 9,000 Ohio jobs, 1,400 regional jobs); food service worker (105,000

national jobs, 2,500 Ohio jobs, 450 regional jobs); and office helper (71,000 national jobs, 2,200

Ohio jobs, 300 regional jobs).  Tr. 1059-1060.

Next, the ALJ asked the VE whether the VE's answer would change if the hypothetical

individual required a cane for ambulating distances, not for rising or sitting or for balance.  Tr.

1060.  The VE responded that such an individual could not perform the jobs identified.  Tr. 1060.

The ALJ asked if there were any jobs such an individual could perform at the light or the

sedentary level and the VE answered that there were not.  Tr. 1060.  He explained that cane use

for light work would make the individual a one-handed person while mobile, and at the sedentary

level, the cane is less relevant but there would be no jobs because of the limitations on

interacting with the public and production quotas.  Tr. 1060.  The ALJ asked whether the VE's answer would change with respect to the first hypothetical individual if the individual would be off task 10 percent of the time and the VE answered that his answer would not change, i.e., such an individual could still perform the jobs identified.  Tr. 1062.  The ALJ asked the VE if his answer would change if the individual would be off task 20 percent of the time and the VE answered that there would be no work such an individual could perform. Tr. 1062-1063.

Patterson's attorney asked the VE whether the first hypothetical individual described by the ALJ could perform work if that individual was limited to sedentary, not light, work.  Tr. 1064.  The VE answered that there would be no work such an individual could perform.  Tr. 1064.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her July 30, 2015, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 21, 2012.  Tr. 85.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset date.  Tr. 85.

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: depression, anxiety, and facet arthropathy.  Tr. 85.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 87.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: He can occasionally use ramps or stairs, but cannot use ladders, ropes, or scaffolds.  The claimant can perform occasional stooping, and frequent kneeling, crouching, and crawling.  The claimant must avoid even moderate exposure to hazards including moving machinery and unprotected heights.  The claimant can maintain attention to carry out repetitive tasks and make simple decisions independently. The claimant can interact appropriately with supervisors and coworkers on a superficial basis and is limited to occasional and superficial interaction with the public.  The claimant can adapt to a setting where the duties are routine and predictable, but he should not be in a job with strict time limits or production quotas.   Tr. 88.

6.      The claimant is unable to perform any past relevant work.  Tr. 91.

7.      The claimant has been a younger individual age 18-49 since the alleged onset date.  Tr. 92.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 92.

9.      Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 92.

10.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform.  Tr. 92.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 17, 2012, through the date of this decision. Tr. 93.

**V. Parties' Arguments**

Patterson objects to the ALJ's decision on three grounds.  He argues that the ALJ erred when she applied the rule in *Drummond* and found that she was bound by a prior ALJ's decision; that the ALJ erred at Step Two because she did not find Patterson's kidney disease and obesity to be severe impairments and she failed to consider these diseases in subsequent steps in her evaluation; and that the ALJ erred when she found that Patterson's spine impairment did not meet or equal Listing 1.04.  Doc. 16, pp. 18-24.  In response, the Commissioner submits that the ALJ did not err, her decision is supported by substantial evidence, and that any alleged error is harmless.  Doc. 18, pp. 12-17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The rule in *Drummond*

In *Drummond v. Comm'r of Soc. Sec*, the Sixth Circuit stated, "absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."  126 F.3d 837, 842 (6th Cir. 1997).  The Social Security Administration acquiesced in this

ruling.  *See* Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998) ("AR 98-4").  In AR

98-4, the Administration explained,

> When adjudicating a subsequent disability claim with an unadjudicated period arising
> under the same title of the Act as the prior claim, adjudicators must adopt such a finding
> from the final decision by an ALJ or the Appeals Council on the prior claim in
> determining whether the claimant is disabled with respect to the unadjudicated period
> unless there is new and material evidence relating to such a finding or there has been a
> change in the law, regulations or rulings affecting the finding or the method for arriving
> at the finding.

*Id*. at *3.

Patterson argues that the ALJ's decision to apply *Drummond* and accept the prior ALJ's

RFC finding was error.  Docs. 16, pp. 18-20; 19, pp. 1-2.  Specifically, he asserts that it was error

for the ALJ to rely on the state agency reviewing physicians, who both applied *Drummond* and

adopted the prior ALJ's RFC, because both these physicians rendered their opinions early on in

the record, "before Patterson failed conservative case and required additional back surgery in

January 2015 [] and before he began developing symptoms from what was later determined to be

renal carcinoma in May 2015."  Doc. 19, p. 2.  He also claims that the ALJ "never considered the

fact that Patterson had become obese since the prior ALJ['s] decision."  Doc. 16, p. 20.

Defendant contends that substantial evidence in the record supports the ALJ's decision; namely,

treatment notes that the ALJ referenced that show that Patterson's impairments did not worsen

since the prior decision in 2012.  Doc. 18, pp. 14-15.

### 1.  Back/lumbar spine

The ALJ gave great weight to the state agency reviewing physicians' opinions applying

*Drummond* and accepting the prior ALJ's RFC finding.  Tr. 91.  She noted the date of Dr. Bolz's

opinion (August 16, 2013), and explained,

> The subsequently provided medical evidence does not demonstrate a significant change in the claimant's condition.  While there is some evidence of limited strength and range of motion, there is also evidence of full range of motion and strength.

Tr. 91.  Elsewhere in her decision, the ALJ identified specific portions of the record in chronological order that illustrated her point; acknowledged lumbar spine MRI results from September 2014 and that Patterson had nerve block treatment and a lumbar fusion surgery in January 2015; accurately observed that Patterson's back and leg pain improved significantly after surgery; stated that his back pain worsened after he fell getting out of the bathtub but that he was "only diagnosed with lumbar strain" and that a CT scan showed intact hardware and no fracture; and explained that his neurologist noted, after his fall, that he had a normal gait and ambulation, full extremity strength, sensation and reflexes, and that the doctor did not indicate that Patterson used or needed a cane.  Tr. 89-90.  Finally, the ALJ found that Patterson was not entirely credible because there was evidence of significantly greater physical abilities than he alleged.  Tr. 90.

Patterson does not dispute the accuracy of any of these findings by the ALJ.  Instead, he asserts that the state agency reviewing physicians who adopted the prior ALJ's RFC provided their opinions based on a record compiled in 2013, before Patterson's second back surgery, and argues that there was material evidence of a worsening back condition.  Docs. 16, pp. 18-20; 19, pp. 1-2.  However, as explained above, the ALJ considered the timing of the state agency reviewers' opinions and discussed Patterson's second back surgery.  She did not find material evidence of a worsening back condition and cited to evidence to support her conclusion.  She complied with AR 98-4 and the rule in *Drummond*.  In short, Patterson merely urges the Court to reweigh the evidence, which the Court cannot do.  *See Huan v. Comm'r of Soc. Sec.*, 107 Fed. App'x 462, 465 (6th Cir. 2004) (when considering an ALJ's *Drummond* determination, a court

does not reweigh evidence on appeal); *Garner*, 745 F.2d at 387.  Accordingly, the ALJ's

decision should be affirmed.  *Id*.

### 2.  Kidney disease/cancer

Patterson argues that the ALJ failed to consider his kidney disease that had developed

since the date of the prior ALJ's decision.  Doc. 16, pp. 18-19.  The ALJ considered whether

Patterson's kidney issues were a significant impairment at Step Two:

> There is no substantial evidence of any other impairment that is "severe."  Imaging in
> September 2014 demonstrated a renal lesion (Exhibits B15F and B28F at 10).  Upon a
> follow-up, it was determined to be renal cell carcinoma (Exhibits B29F at 15).  A left
> radical nephrectomy was recommended and performed in May 2015 (Exhibit B29F at
> 46).  However, the claimant quickly improved (Exhibit B29F at 85-95).  There was no
> evidence that the cancer spread or any evidence of recurrence.  Therefore, the
> undersigned finds that this impairment was not severe for at least 12 months and is not
> expected to continue to result in more than minimal limitations in work-related
> functioning.

Tr. 86.  Patterson, block quoting passages from his brief to the Appeals Council, argues that he

"continues to suffer from chronic fatigue secondary to losing his left kidney" and states that he

testified to swelling in his ankles and at the site of his kidney surgery at the second hearing, as

well as chronic fatigue.  Docs. 16, p. 19; 19, p. 2 (citing Tr. 1045).

However, Patterson did not testify at the hearing that he suffered from chronic fatigue

and he identifies no specific records wherein a medical professional had found he suffers from

chronic fatigue as a result of his chronic kidney disease.  The most he testified to with respect to

his kidney was that he was unable to mow the lawn because of his back and his "left kidney

stopped me.  It's only been a month.  So over a month since I had my [left] kidney removed."

Tr. 1051-1052.  Notably, he did not testify that his kidney disease caused him to have physical

limitations.

In his reply brief, Patterson argues that the ALJ did not "differentiate between Patterson's cancer and the effects of his cancer treatment.  Patterson lost a kidney.  This condition can be expected to last for a continuous period of at least 12 months[.]"  Doc. 19, p. 2.  However, the issue before the ALJ was not whether Patterson had a kidney removed but how, if at all, the loss of his kidney caused an impairment that limited his ability to perform work-related functions.  Patterson does not identify evidence in the record indicating how the removal of his kidney caused permanent limitations on his ability to perform work-related functions.  The ALJ did not err when she found that Patterson's kidney issues did not cause such limitations.

### 3.  Obesity

Patterson argues that the ALJ erred because she failed to consider that he "had become obese since the prior ALJ decision."  Doc. 16, p. 20.  In support of his argument, Patterson cites to pages of the transcript wherein his body mass index was listed or his weight and height were listed from which a body mass index could be calculated.

An ALJ must consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation.  *Miller v. Comm'r of Soc. Sec*., 811 F. 3d 825, 835 (6th Cir. 2016); SSR 02-1p, 2002 WL 34686281, *3-4.  Obesity will be considered when it is evidenced by a diagnosis of obesity or treatment notes from an examining physician listing the claimant's height, weight and appearance, and when it appears in the record in a consistent pattern.  *Id*.

As discussed above, the ALJ adopted the prior ALJ's decision dated February 16, 2012.  Contrary to Patterson's assertion, that prior decision discussed Patterson's obesity and the ALJ found that it did not have more than a minimal effect on his ability to perform basic work activities.  Tr. 154.  The prior ALJ listed Patterson's height and weight as 6'5" and 287 pounds,

which is obese.[3]  Tr. 154.  Although Patterson points to various portions of the record since that prior decision showing that he weighed more than 300 pounds in 2013, including 304-313 pounds (Doc. 16, p. 20 (citing Tr. 464, 370)), the record also indicates that he weighed 268 pounds in November 2014 (Tr. 785), 270 pounds in March 2015 (Tr. 879), 275 pounds in April 2015 (Tr. 834), and, at the supplemental hearing in June 2015, Patterson stated that he was 6'4" tall and weighed 274-275 pounds (Tr. 1052).  In other words, although Patterson gained weight in 2013, he lost weight in 2014 and weighed less in 2014 and 2015 than he did at the time of the prior ALJ's decision in 2012.  This is not evidence of a worsening condition; nor does Patterson point to anywhere in the record wherein a medical provider stated that his weight was causing a worsening of his impairments.  The ALJ did not err when she did not consider Patterson's obesity because she adopted the decision of the prior ALJ who did consider his obesity and he does not show that this condition worsened.

In sum, the ALJ did not err when she applied the rule in *Drummond* and adopted the prior ALJ's RFC finding.  In addition to his arguments that the ALJ's adoption of the prior ALJ's decision was erroneous because of her alleged failure to consider his kidney issues and obesity, Patterson also argues, as a stand-alone claim, that the ALJ failed to properly consider his chronic kidney disease and obesity.  Doc. 16, p. 17.  For the same reasons explained above, the ALJ did not fail to properly consider Patterson's chronic kidney disease and obesity.

### B. Patterson's Step Three argument

---

[3]  SSR 02-1p provides,

> The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

2002 WL 34686281, at *2.  A height and weight of 6'5" and 287 pounds is a BMI of 34.

Patterson argues that the ALJ erred at Step Three when she found that he did not meet or equal Listing 1.04, Disorders of the spine.  Doc. 16, p. 22.

In his opening statement at the first hearing before the ALJ on his current application, Patterson's attorney expressly disclaimed reliance on Step Three,[4]

> [W]e're arguing disability at step five, your honor, the combination of the physical and the mental would result in him being off task an impermissible amount of time.

Tr. 108.  At the supplemental hearing, Patterson's attorney reiterated,

> We're not looking for disability at step three here.  We're looking squarely at step five, a combination of symptoms caused by his impairments.

Tr. 1034.  These statements to the ALJ directly contradict Patterson's argument here.

Patterson waived his challenge to the ALJ's Step Three determination based on the invited error doctrine.  "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit."  *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991).  This doctrine has been applied to administrative proceedings, *see Johnson v. I.N.S.*, 971 F.2d 340, 343 (9th Cir. 1992); *St. Anthony Hosp. v. Dept. of H.H.S.*, 309 F.3d 680, 696 (10th Cir. 2002); *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516 (4th Cir. 2014), including social security disability cases.  *See Tracy v. Astrue*, 518 F.Supp.2d 1291, 1305-1306 (D.Kan. 2007) (the doctrine of invited error prevents a social security claimant's challenge to an ALJ's Step Three finding when the claimant's attorney made affirmative statements to the ALJ at the hearing that the claimant did not meet a listing); *Gies v. Colvin*, 2016 WL 4943969, at *9, n.2 (E.D.Cal. Sept. 16, 2016) (claimant's attorney stated at the hearing that that he did not meet a listing and "focused solely on step five of the evaluation ... due to a combination of his physical

---

[4]  Patterson's current attorney represented him at both hearings on his application that is at issue here.

and mental impairments"; the court observed, "The doctrine of "invited error" has been applied

in social security cases and the Court finds no reason that it should not apply here."); *Williams v.*

*Astrue*, 2011 WL 1059124, at *3 (D.Or. March 21, 2011).

Moreover, the ALJ did not err in her Step Three determination.  Listing 1.04 is defined as

follows:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal
> stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),
> resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.
> With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic
> > distribution of pain, limitation of motion of the spine, motor loss (atrophy with
> > associated muscle weakness or muscle weakness) accompanied by sensory or
> > reflex loss and, if there is involvement of the lower back, positive straight-leg
> > raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A.  With respect to Listing 1.04, the ALJ

explained,

> The severity of the claimant's physical impairments does not meet or medically equal the
> level of severity described in section 1.40 (Disorders of the spine), or any other section of
> 20 CFR Part 404, Subpart P, Appendix 1.  The claimant does not have the neurological
> deficits, nerve root compression, spinal arachnoiditis or lumbar spine stenosis described
> in Section 1.04 of the Listing of Impairments.

Tr. 87.

Patterson argues, "The ALJ's assessment is incorrect as a September 2014 MRI

confirmed foraminal stenosis at L3-4 (TR 751)."  Doc. 16, p. 23.  He also asserts that he meets

subsection A, "evidence of nerve root compression."  Doc. 16, p. 23.  In other words, he argues

that he meets a portion of the introductory paragraph of Listing 1.04 and Subsection A; he has

not shown that he satisfies all the requirements of the introductory paragraph of Listing 1.04, i.e.,

spinal stenosis that *results in compromise of a nerve root or the spinal cord.  See Sullivan v.*

*Zebley*, 493 U.S. 521, 530 (1990) (a claimant must meet all of the specified medical criteria to

meet a listing: "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Buress v. Sec'y of Health & Human Servs*., 835 F.2d 139, 140 (6th Cir. 1987) (a claimant has the burden of showing her condition is equivalent to a listed impairment). Because Patterson cannot show that he satisfies the criteria of Listing 1.04, any purported infirmity in the ALJ's Step Three determination considering Listing 1.04 is harmless. *See Todd v. Astrue*, 2012 WL 2576435 at *10 (N.D. Ohio May 15, 2012) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: October 31, 2016

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986)